# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **PIERRE CORMIER**, *et al.*<br><br>               **Plaintiffs,**<br>   **v.**<br><br>**WESTERN EXPRESS, INC.,** *et al.*<br><br>            **Defendants.** | **Case No. 14-0029** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF COLLECTIVE ACTION SETTLEMENT, APPROVAL OF ATTORNEYS FEES, REIMBURSEMENT OF COSTS, AND SERVICE PAYMENTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

PROCEDURAL HISTORY .......................................................................................... 2

SETTLEMENT TERMS ............................................................................................. 4

LEGAL ARGUMENT ................................................................................................. 6

I.   Final Approval of the Settlement is Appropriate. ............................................. 6

II.  The Court Should Approve the Proposed Settlement Under the FLSA. ......................... 10

   A. The Proposed Settlement resolves a *Bona Fide* Dispute. ................................10

   B. The Proposed Settlement is Fair and Reasonable. ......................................13

      1.   There is No Collusion or Fraud Involved in the Proposed Settlement ................. 14

      2.   The Complexity, Expense, and Likely Duration of the Litigation ...................... 15

      3.   The State of the Proceedings and the Amount of Discovery Completed .............. 16

      4.   The Probability of Plaintiff's Success on the Merits and Range of Possible Recovery ...................................................................................... 17

      5.   Mr. Joseph Wimer's objections should be overruled............................. 18

      6.   The Opinions of Counsel ...................................................... 22

   C. The Settlement is Consistent with Public Policy...........................................24

III. The Requested Attorneys' Fees and Costs are Reasonable and Should Be Approved..... 24

   A. The FLSA Mandates that Reasonable Attorney's Fees be Paid to Class Counsel...........24

   B. A Percentage-Of-The-Fund Fee Allocation is Appropriate. ...........................26

      1.   The Time and Labor Required. the Preclusion of Employment by the Attorney Due to Acceptance of the Case, and the Nature and Length of the Professional Relationship with the Client............................................................... 28

      2.   The Novelty and Difficulty of the Questions and the Skill Requisite to Perform the Legal Service Properly........................................................ 29

      3.   The Experience, Reputation, and Ability of the Attorneys.................... 30

      4.   The Customary Fee, Whether the Fee is Fixed or Contingent and Awards in Similar Cases ....................................................................... 30

      5.   The Amount Involved and the Result Obtained .................................. 31

      6.   The "Undesirability" of the Case ........................................... 31

      7.   Lodestar Cross-check.......................................................... 32

IV.  The Court should reward Class Counsel with Reimbursement for their Out-of-Pocket Costs.............................................................................................. 35

V.   The Court should award the settlement administrator its costs and fees. ........................ 36

VI.  This Court should award the requested service payments for Named Plaintiffs. ............. 36

CONCLUSION........................................................................................................ 38

# TABLE OF AUTHORITIES

## Cases

*Avalon Cinema Corp. v. Thompson*, 689 F.2d 137 (8th Cir. 1982) ................................ 28

*Baouch v. Werner Enterprises,* 908 F.3d 1107 (8th Cir. 2018) .................................... 13

*Baouch v. Werner Enters.*, 2014 U.S. Dist. LEXIS 64981 (D. Neb. May 12, 2014) .................. 24

*Bessey v. Packerland Plainwell, Inc.*, 2007 WL 3173972 (W.D. Mich. Oct. 26, 2007) ............. 27

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ................................................ 26

*Bredbenner v. Liberty Travel, Inc.* 2011 U.S. Dist. LEXIS 38663 (D. NJ. Apr. 8, 2011) 26, 27, 31

*Browne v. P.A.M. Transport, Inc.*, 5:16-CV-5366, 2018 WL 5118449 (W.D. Ark. Oct. 19, 2018) ...................................................................................... 13

*Camp v. Progressive Corp.,* 2004 WL 2149079 (E.D. La. Sept. 23, 2004) ...................... 14, 15

*Campbell v. C.R. England, Inc.,* 2015 U.S. Dist. LEXIS 134235 (D. Utah Sept. 30, 2015).... 9, 24

*Carroll v. Blumaq Corp.,* 2010 WL 11520634 (E.D. Tenn. Nov. 10, 2010) ........................ 6, 7

*Chemi v. Champion Mortg.*, 2009 U.S. Dist. LEXIS 44860 (D.N.J. 2009) ......................... 27

*Churchill Village, LLC v. Gen. Elec. Co.*, 361 F.3d 566 (9th Cir. 2004) ....................... 7

*Collins et al. v. Sanderson Farms, Inc., et al.,* 568 F.Supp.2d 714 (E.D. La. July 9, 2008) ........ 14

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ............................................. 15

*Cruz v. Vel-A-Da, Inc.,* 1993 WL 659253 (N.D. Ohio May 14, 1993 ............................. 26

*D.R. by MR. v. East Brunswick Bd. of Educ.,* 109 F.3d 896 (3d Cir. 1997) ..................... 24

*Dees v. Hydradry, Inc.,* 706 F. Supp. 2d 1227 (M.D. Fla. 2010) ............................... 14

*Dewey v. Volkswagen Aktiengesellschaft,* 558 Fed. Appx. 191, 199 (3d Cir. 2014) .............. 28

*Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 592-93 (D. NJ. 2010) ...................... 33

*Does 1 v. Deja Vu Consulting, Inc.*, No. 17-1801, 2019 WL 2336927 (6th Cir. June 3, 2019).. 19, 23

*Fegley v. Higgins*, 19 F.3d 1126, 1134-35 (6th Cir. 1994 .................................. 26, 31

*Felix v. Thai Basil At Thornton, Inc.,* 2015 U.S. Dist. LEXIS 62020 (D. Colo. May 6, 2015).... 11

*Gokare v. Fed. Express Corp.*, No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094887 (W.D. Tenn. Nov. 22, 2013) ............................................................................. 27

*Greene v. Hepaco, LLC*, 2014 WL 2624900 (W.D. Tenn. June 12, 2014) ......................... 14

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000) ............................. 29

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1988) ..................................... 7

*Heder v. City of Two Rivers*, 255 F.Supp.2d 947 (E.D. Wis. 2003) ......................... 26, 31

*Hensley et al. v. Eckerhart et al.* 461 U.S. 424 (1983) ..................................... 28

*In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *40 (E.D. Pa. Jan. 4, 2001) ....................................................................................... 36

*In re AT&T Corp.,* 455 F.3d 160 (3d Cir. 2006) ........................................ 26, 29, 33

*In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *35-36 (E.D. Pa. Oct. 13, 2004) ......................................................... 36

iii

*In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3d Cir. 2001)................................................. 28, 31

*In re Fasteners Antitrust Litig.,* 2014 U.S. Dist. LEXIS 9990 (E.D. Pa. Jan. 27, 2014) ............. 36

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d. Cir. 1995) .......................................................................................................................... 15, 31

*In re Janney*, 2009 U.S. Dist. LEXIS 60790 (E.D. Pa. 2009) ...................................................... 27

*In Re Prudential Ins.,* 148 F.3d 283 (3d Cir. 1998) .................................................................... 33

*In re Rite Aid*, 396 F.3d 294, 306 (3d. Cir. 2005) .................................................................. 33, 34

*In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387 (E.D. Tenn. May 17, 2013) .... 27

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 (3d Cir. 2004)........................................... 7

*Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615 (6th Cir. 2007) .............................................................................................. 8

*Johnson v. Georgia Highway*, 488 F.2d 714 (5th Cir. 1974)...................................................... 29

*Johnson v. Midwest Logistics Sys.*, Ltd., 2013 WL 2295880 (S.D. Ohio May 24, 2013) ........... 27

*Julian v. Swift Transportation Co. Inc.*, 360 F. Supp. 3d 932 (D. Ariz. 2018)............................ 13

*Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889 (E.D. Pa. 2014) ........................... 9, 23

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371 (8th Cir. 1990) . 6

*Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010), ........................... 18, 27

*Lynn's Food Stores*, 679 F.2d 1350 (11th Cir. 1982) ........................................................ 6, 8, 10

*Maddy v. Gen. Elec. Co.,* 2017 WL 2780741 (D.N.J. June 26, 2017)..................................... 9, 23

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1998)................................. 7

*Michigan Corrections Org. v. Michigan Dept. of Corrections*, 774 F.3d 895 (6th Cir. 2014) .... 20

*Missouri v. Jenkins by Agyei*, 491 U.S. 274, 289 (1989)........................................................... 31

*Morales v. Farmland Foods, Inc.*, No. 8:08CV504, 2013 WL 1704722 (D. Neb. Apr. 18, 2013) ................................................................................................................................ 32

*Nutting v Unilever Mfg. (U.S.) Inc.*, 2014 WL 2959481 (W.D. Tenn. June 13, 2014)................ 14

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) .................................. 7

*Ortega v. Uponor, Inc. (In re Uponor, Inc.)*, 716 F.3d 1057 (8th Cir. 2013)................................ 7

*Perdomo v. Sears, Roebuck & Co.,* 1999 WL 1427752 (M.D. Fla. Dec. 3, 1999)................ 26, 31

*Perrin v. John B. Wbb & Assocs.,* 2005 WL 2465022, at *4 (M.D. Fla. Oct. 6, 2005)............... 31

*Pessoa v. Countrywide Home Loans, Inc.,* 2007 WL 101777 (M.D. Fla. April 2, 2007) ........... 14

*Petrone v. Werner Enter.*, 2017 WL 510884 (D. Neb. Feb. 2, 2017)......................................... 12

*Petrone v. Werner Enters.*, 121 F.Supp.3d 860 (D. Neb. 2015)................................................. 12

*Petrone v. Werner Enters.*, 2013 U.S. Dist. LEXIS 96375 (D. Neb. July 10, 2013)................... 24

*Physicians of Winter Haven LLC v. Steris Corp.*, No. 1:10 CV 264, 2012 WL 406966 (N.D. Ohio Feb. 6, 2012), *report and recommendation adopted*, No. 1:10CV264, 2012 WL 406976 (N.D. Ohio Feb. 8, 2012) ............................................................................................................ 27

*Rampersad v. Certified Installation LLC,* 2012 WL 5906878 (E.D. Tenn. Nov. 26, 2012) ......... 8

*Salinas v. U.S. Express Enterprises, Inc.* , 2018 WL 1477127 (E.D. Tenn. Mar. 8, 2018)........... 9

*Speed Shore Corp. v. Denda*, 605 F.2d 469 (9th Cir. 1979)........................................................ 7

*Thompson v. United Stone, LLC, et al.*, 2015 WL 867988 (E.D. Tenn.Mar. 2, 2015) ....... 7, 10, 26

iv

*United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307 v. G & M Roofing and Sheet Metal Co.*, 732 F.2d 495 (6th Cir. 1984)............................................. 26

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................................ 7

*Williams v. Bevill*, 2016 WL 773230 (E.D. Tenn. Feb. 8, 2016)................................................ 31

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910)....................................................................... 14

## Treatises

*Court Awarded Attorney Fees, Report of Third Circuit Task Force*, 108 F.R.D. 237 (1985)...... 26

Newberg On Class Actions § 11.41 (4th ed. 2002) ........................................................................ 7

## Regulations

29 C.F.R. § 785.18 ......................................................................................................................... 11

29 C.F.R. § 785.22 ......................................................................................................................... 11

## INTRODUCTION

On February 7, 2019, the Court granted preliminary approval of a collective action settlement in the instant matter.[1] ECF Doc. No. 240. With the assistance of Mediator Hunter Hughes during a mediation session that took place on September 6, 2018, the Parties reached a settlement in which Western Express, Inc., ("Western Express" or "Defendant"), while denying liability and disputing damages, has agreed to pay $3,825,000 to settle all claims in this action.

As set forth in the amended complaint, Plaintiffs assert claims for minimum wage violations under the federal Fair Labor Standards Act ("FLSA"). Plaintiffs seek compensatory damages for the claimed violations, as well as liquidated damages, attorney's fees, costs of suit, and class representative service payments. The $3,825,000 will settle all such claims.

The parties have litigated this matter extensively since 2014. The parties engaged in extensive discovery and motion practice and retained experts. By the time the Parties agreed to a settlement, all were able to appropriately evaluate the attendant risks of continued litigation. While the settlement does not provide class members with the equivalent of their best day in court, it clearly provides class members with substantially more than they would receive on their worst day, and the class is accepting of this result.

The settlement administrator sent the Notice of Class and Collective Action Settlement ("Notice") to each of the approximately 4,200 collective action members. The Notice, after describing the terms and conditions of the settlement, describes how class members may object to the settlement. Only a single individual filed an objection. *See* Declaration of Platt, attached hereto as Exhibit 2, at ¶ 13. Moreover, as discussed in detail below, the objection provides no basis to

---

[1] For purposes of this Memorandum of Law, Plaintiffs incorporate by reference the Definitions contained in the Joint Stipulation and Settlement Agreement ("Settlement Agreement"), filed with the Court at ECF Doc. No. 239-2.

1

deny approval. The individual objected contending that he believes he could get more money if the claims were won on the merits, but his objection fails to account for the risk associated with obtaining such a result. While his objection criticized the settlement as being too low, a review of that collective action member's time worked and potential damages under various theories of recovery demonstrates that the settlement provides this individual with a fair and reasonable compromise of his potential damages. Regardless, a single objector out of more than 4,000 plaintiffs demonstrates that the class as a whole is pleased with the settlement, believes the settlement to be fair, and wants to be paid without further delay.

Accordingly, in the interest of judicial economy, and because the proposed settlement is fair, reasonable, and adequate, Plaintiffs respectfully request that the Court grant final approval of the settlement.

Likewise, Plaintiffs ask the Court to approve their requests for attorneys' fees, service payments, and reimbursement for costs, to be paid out of the settlement fund. As briefed below, Class Counsel has litigated this matter for over five years, has spent more than 1,700 hours litigating these claims and has incurred more than $300,000 in out-of-pocket litigation costs. The requested fee is well in line with fees routinely awarded to class counsel in wage and hour class actions settlements. Likewise, the service payment to the Named Plaintiffs and the Deponent Opt-In Plaintiffs are well in line with service payments typically approved.

Thus, for the reasons stated above and more fully briefed below, the Court should grant approval of the settlement.

## PROCEDURAL HISTORY

On January 13, 2014, four over-the-road truck drivers filed a collective action complaint against Western Express, Inc., in the United States District Court for the Middle District of

Tennessee. The lawsuit, styled *Cormier, et al. v. Western Express, Inc. et al.* (No. 14-cv-0029), alleged, *inter alia*, that Western Express failed to pay proper minimum wage in violation of federal law. (ECF Doc. No. 1). Plaintiffs filed their Amended Complaint on April 4, 2014.

On April 21, 2014, Defendant filed an Answer to Plaintiffs' First Amended Complaint denying the claims in their entirety. The Parties thereafter commenced and conducted discovery, including depositions of the Named Plaintiffs.

From November 2014 to March 2015, the Parties attended three (3) mediation sessions in an attempt to settle the case. Although the Parties made progress, the mediation sessions were not ultimately fruitful. This was, in part, because the size of the class, or the number of opt-in plaintiffs, remained unknown. Consequently, on April 14, 2015, the Parties filed a Stipulation to Conditionally Certify as a Collective Action and for court-supervised notice to be sent to potential class members. Court-supervised notice was executed, and, by the October 7, 2015 cutoff date, more than 4,000 opt-ins filed Consent to Join forms. After this time, additional consent forms were filed; ultimately, approximately 4,200 individuals in total filed Consent to Join forms.

On April 29, 2016, the Parties conducted a fourth mediation. Although the Parties made substantial progress, no settlement was agreed to. Informal settlement discussions continued into June of 2016, but the Parties were still too far apart, and settlement discussions stalled out in order for discovery to continue.

Additional discovery took place over the next two years, including written discovery requests served on a subset of opt-in plaintiffs, depositions of opt-in plaintiffs, depositions of Defendants' staff members, and significant additional data discovery.

On September 7, 2018, after conducting extensive discovery and investigation as described below, the Parties attended a fifth mediation before mediator Hunter Hughes, who has significant

experience mediating wage-and-hour collective actions. The parties made substantial progress with the assistance of the mediator and were able to reach a Memorandum of Understanding on a settlement agreement with the principal terms set forth in the Settlement Agreement. Specifically, while denying liability and disputing damages, Defendant agreed to pay $3,825,000 to settle all claims in the Litigation.

On January 11, 2019, Plaintiffs filed for preliminary approval of this settlement. The Court granted Preliminary Approval on February 7, 2019. Notice of the settlement was mailed to the collective action class members on March 28, 2019, with a deadline to object by May 27, 2019. As May 27, 2019 was Memorial Day, the objection deadline was May 28, 2019. On April 22, 2019, Opt-In Joseph Wimer filed an objection to the settlement with the Court. No other objections have been received. Plaintiffs now file their motion for final approval of the settlement, and approval of attorneys fees, costs, and service payments.

## SETTLEMENT TERMS

With the assistance of Hunter Hughes, the Parties agreed to the following settlement terms[2]:

1. Western Express will pay $3,825,000 into an Escrow Account to be created and controlled by the Claims Administrator, to be distributed to members of the FLSA collective action class ("Class Member") (finally certified for purposes of settlement only), subject to the formula described below. (Settlement Agmt. § 2.5, 4.1, 5.1).

2. A Class Member's proportionate share of the Net Settlement Amount, which equals the Class Settlement Amount less any amounts approved by the Court under Sections 5.1.2-5.1.5,

---

[2] The settlement terms (including the definitions of the initial capitalization words) are set forth in greater detail in the Joint Stipulation Settlement and Release Agreement, ECF Doc. No. 239-2.

4

shall be determined based on a flat payment plus their pro-rated amount for each week worked following terms as set forth in the Settlement Agreement. (Settlement Agmt. §5.1.1).

3.      All Class Members shall receive a flat $50 payment plus an additional pro-rated amount for each week worked. (Settlement Agmt. §5.1.1.1).

4.      Each Class Member shall receive a total settlement distribution of: (1) the total of the flat payment and (2) the dollar value of the pro-rated Net Settlement Amount for each week worked as an employee driver during the Class Period. (Settlement Agmt. §5.1.1.4).

5.      Class Members' payments shall be 50% taxable wages, which will be reported on a W-2 form, and 50% liquidated damages, which will be reported as non-wage income on a 1099 form. (Settlement Agmt. §5.1.6).

6.      The Parties engaged Claims Administrator, Angeion Group, LLC, to administer the Notice of Settlement and the allocation and distribution of the Settlement Payment; the Claims Administrator will report periodically to counsel for Plaintiffs and Western Express and the Claims Administrator's fees will be paid out of the Settlement Fund. (Settlement Agmt. §§5.1, 5.1.1, 5.1.5, 5.1.7, 6.1-6.4, 7.1). All costs associated with the settlement, including but not limited to the employer's portion of applicable tax withholdings, will be paid out of the Settlement Fund. (Settlement Agmt. §2.2, 2.5).

7.      The settlement provides that the Class Members fully release Western Express from all state and federal wage and hour claims for Western Express's alleged failure to pay for hours worked and for Western Express's alleged failure to pay minimum wages due for any time in which Western Express designated the Class Member as an employee, as well as for attorneys' fees and costs related to such claims, through January 1, 2019. (Settlement Agmt. §§ 2.17-2.18, 2.21, 8.1-8.2).

8.    Some Class Members may also have driven for Defendant as an independent contractor and/or independent contractor lease/purchase driver during the Class Period. The settlement releases claims for all times the Class Members were employee drivers of Defendant, but excludes from release claims based on time any Class Member was classified as an independent contractor driver for Defendant, regardless of whether such classification is ultimately challenged and reversed or determined to be proper. (Settlement Agmt. §§ 5.1.1.4, 8.1.4)

9.    Any amounts left in the Settlement Fund as a consequence of a class member not cashing his or her check will be donated to the Wayne Wise Wellness Fund and the St. Christopher Truckers Development and Relief Fund, 501(c)(3) charities which support truck drivers (Settlement Agmt. §7.1.8).

## LEGAL ARGUMENT

### I.    <u>Final Approval of the Settlement is Appropriate.</u>

The law favors compromise and settlement of collective and class action suits. *Carroll v. Blumaq Corp.,* 2010 WL 11520634 (E.D. Tenn. Nov. 15, 2010)*; see also Lynn's Food Stores*, 679 F.2d 1350, 1354 (11th Cir. 1982); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1,* 921 F.2d 1371, 1388 (8th Cir. 1990) (in a class action context, providing that "[a] strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor"); *Ortega v. Uponor, Inc. (In re Uponor, Inc.)*, 716 F.3d 1057, 1063 (8th Cir. 2013) (in a class action context, providing that "[a] settlement agreement is presumptively valid.");  *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 535 (3d Cir. 2004) ("there is an overriding public interest in settling class action litigation, and it should therefore be encouraged"); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context") (internal quotations omitted); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[V]oluntary conciliation and

6

settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation."); *Speed Shore Corp. v. Denda*, 605 F.2d 469, 473 (9th Cir. 1979) ("It is well recognized that settlement agreements are judicially favored as a matter of sound public policy. Settlement agreements conserve judicial time and limit expensive litigation."); Newberg On Class Actions § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

The approval of a proposed class action settlement is a matter of discretion for the trial court. *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986); *Churchill Village, LLC v. Gen. Elec. Co.*, 361 F.3d 566, 575 (9th Cir. 2004); *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1998). In exercising this discretion, courts should give "proper deference to the private consensual decision of the parties." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1988).

A court reviewing a settlement of FLSA claims must conclude that it is "fair, reasonable, and adequate." *Carroll v. Blumaq Corp.,* 2010 WL 11520634 *2 (E.D. Tenn. Nov. 10, 2010); *see also Thompson v. United Stone, LLC, et al.*, 2015 WL 867988 *2 (E.D. Tenn. Mar. 2, 2015); *Int'l Union*, *United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.,* 497 F.3d 615, 631 (6th Cir. 2007). The court must also determine whether the settlement reflects a reasonable compromise over issues that are *actually* in dispute. *Rampersad v. Certified Installation LLC,* 2012 WL 5906878, at *1 (E.D. Tenn. Nov. 26, 2012) (citing *Lynn's Food Stores, Inc. v. United States*, 697 F.2d 1350, 1354 (11th Cir. 1982).

After significant litigation, the Parties attended a mediation session before Hunter Hughes. The mediation lasted approximately ten hours and resulted in significant concessions from both sides. The settlement provides a fair compromise of the claims asserted. The settlement was not

7

the result of a backdoor agreement but instead the result of the Parties and their counsel fully evaluating the risks of continued litigation and the benefits of settlement under the auspices of an experienced class action, employment law mediator.

Second, more than sufficient discovery has been exchanged to permit the Parties to fully understand the claims and defenses in the Litigation. The Parties have exchanged, reviewed, and analyzed thousands of documents and millions of data points. The Parties have engaged experts to assist with the analysis of the data produced during the discovery period. The Parties have deposed Named Plaintiffs, opt-in plaintiffs, and Defendant's staff. The Parties have engaged in Motion Practice regarding discovery disputes that framed both the legal and evidentiary issues. Accordingly, by the time the Parties convened for mediation on September 6, 2018, the Parties were equipped to fully appreciate the strengths and weaknesses of their respective positions in the Litigation.

Third, the Parties' counsel have significant experience litigating other wage and hour collective and class actions. On the one hand, Plaintiffs' counsel is a respected plaintiffs-oriented employment law firm that has substantial experience litigating wage and hour collective and class actions. Plaintiffs' counsel is trial counsel in a number of pending wage and hour collective and class actions, and has been trial counsel in dozens of wage and hour collective and class actions that have resolved with court approval. *See* Declaration of Justin L. Swidler, attached hereto as Exhibit 1, at ¶ 11; see also *Salinas v. U.S. Express Enterprises, Inc.*, 2018 WL 1477127, at *6 (E.D. Tenn. Mar. 8, 2018), report and recommendation adopted, 2018 WL 1475610 (E.D. Tenn. Mar. 26, 2018 ) (" Plaintiffs are represented by Swartz Swidler, who are well-informed and practiced in collective wage and hour litigation, and are realistic and knowledgeable of the risks and benefits of the settlement. Plaintiff's counsel has substantial experience litigating complex

wage and hour actions, including class actions and certified collective actions with tens of thousands of class members."); *Campbell v. C.R. England, Inc.,* 2015 U.S. Dist. LEXIS 134235, *18 (D. Utah Sept. 30, 2015) (Swartz Swidler, LLC "has a reputation in the trucking industry as being one of the prominent firms to engage in FLSA litigation on behalf of truck drivers."); *Maddy v. Gen. Elec. Co.,* 2017 WL 2780741, at *7 (D.N.J. June 26, 2017) (*"Plaintiffs' counsel has substantial experience litigating wage and hours class actions. Indeed, attorneys Mr. Swidler and Mr. Swartz have litigated 90 [wage and hour] cases within the last 5 years."); *Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889 14 (E.D. Pa. 2014) (finding that Mr. Swartz and Swidler "have considerable experience handling class and collective action disputes" and noting that they "represented the Named Plaintiffs and the prospective class competently, diligently, and with professionalism throughout the course of this litigation.").

Similarly, Western Express is represented by King & Ballow, a respected law firm with a substantial employment law practice, and lead counsel for Defendant, R. Eddie Wayland, is a preeminent management-side employment law practitioner. Accordingly, the Parties' counsel have the experience necessary to fairly evaluate the strengths and weaknesses of their clients' respective positions in the Litigation, and to recommend a settlement to their clients.

Fourth, the response from the class has been exceedingly positive. Notice was mailed to each of the nearly 4,200 collective action class members, *see* Exhibit 2 at ¶ 7, and only a single individual filed an objection. *Id.,* ¶ 13. That objection is discussed below, but the gravamen of the objection is that the objector wishes the settlement was for more money and believes he should be awarded more based on his claims. This does not provide a basis to find that this arms-length and strongly negotiated settlement is not a fair and adequate compromise of disputed wage and hour claims. This is especially the case as the individual's damages based on his pay data and driver log

(time sheet) data reveal that his award is directly in line with the compromise reached: he will receive full value for his DOT "on duty" minimum wage claims, and a discounted value for his sleeper berth claims.

In short, because (1) the settlement was a product of arm's length negotiations, (2) the negotiations followed the exchange of substantial discovery and motion practice, (3) the counsel involved are experienced with wage and hour collective and class action litigation, (4) the Named Plaintiffs have agreed to the settlement, and (5) the class's reaction has been positive, the Court should find the settlement provides a fair and reasonable compromise of the dispute FLSA claims. Accordingly, Plaintiffs respectfully request the Court grant final approval of the FLSA settlement.

## II.     The Court Should Approve the Proposed Settlement Under the FLSA.

### A.     The Proposed Settlement resolves a *Bona Fide* Dispute.

Courts may approve an FLSA settlement where such an agreement represents the "resolution of a bona fide dispute over FLSA provisions." *Thompson v. United Stone, LLC, et al.*, 2015 WL 867988, at *1 (E.D. Tenn. March 2, 2015) (quoting *Lynn's Food Store, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982).

Courts reviewing whether a *bona fide* dispute exists consider the following factors: (1) the nature of the dispute; (2) the employer's business and type of work performed by the employee; (3) the employer's reasons for disputing the employee's right to the claimed wages; (4) the employee's justification for the disputed wages; and (5) if the parties dispute the computation of wages owed, each party's estimate of the number of hours worked and the applicable wage. *Felix v. Thai Basil At Thornton, Inc.,* 2015 U.S. Dist. LEXIS 62020, *3 (D. Colo. May 6, 2015).

Here, Plaintiffs contend that they were paid below the federal minimum wage during the initial orientation and training program of Defendants and while over-the-road. Thus, this matter

10

seeks minimum wage violations (*i.e.* payment for the difference between what Western Express paid drivers and $7.25 per hour).

Specifically, Plaintiffs contend that a substantial amount of time which over-the-road truck drivers spend over-the-road constitutes working time, including all "on duty" DOT time, short rest breaks of 20 minutes or less, *see* 29 C.F.R. §785.18 ("rest periods of short duration, running from 5 minutes to about 20 minutes … must be counted as hours worked"); and sleeper berth time beyond 8 hours per day, *see* 29 C.F.R. § 785.22 (when on duty for more than 24 hours, up to 8 hours of sleep time may be credited as non-work time). While Defendants generally recognized that "on duty" DOT time is compensable, the other periods of time were subject to legal and factual disputes between the Parties.

The settlement will provide an average of $450 per driver in the collective action, after fees, costs, and administrative expenses are paid, but before taxes. This amount gives drivers full value on their alleged non-liquidated damages for "on duty" and short rest break claims (estimated at an average of $150 per driver) and almost 30% of the value for their alleged non-liquidated damages for the remaining claims (estimated at an average of $1000 per driver). Considering the inherent risks in maintaining the collective action through trial, and the legal and factual disputes surrounding the compensability of sleeper berth time and the exclusion of per diem payments from minimum wage calculations, this is a fair result for collective action members.

The law regarding the compensability of sleeper berth time for over-the-road drivers continues to develop, but remains subject to significant uncertainty and risk to both sides. The most significant case which had addressed this issue at the time of the settlement-in-principal was *Petrone v. Werner Enterprises*, a case from the District of Nebraska, which alleged that trainee drivers failed to receive minimum wage because the defendant failed to pay them for, *inter alia,*

sleeper berth time in excess of 8 hours per day. The procedural history of that case alone emphasizes the risks and uncertainty to all Parties should this case not resolve.

In 2015, the *Petrone* court entered summary judgment in the plaintiffs' favor, holding that the DOL guidance, and specifically 29 C.F.R. § 785.22, the DOL Field Operations Handbook, and two opinion letters issued by the DOL, were entitled to *Auer* deference and compel trucking companies to pay over-the-road drivers for sleeper berth time in excess of 8 hours per day. 121 F.Supp.3d 860 (D. Neb. 2015) (Strom, J.). But the *Petrone* court then certified its holding for interlocutory appeal to the Eighth Circuit. The Eighth Circuit denied the petition, and the case was sent to the trial court for a trial on damages.

Prior to that trial, a new judge was assigned to the case, and Werner filed a motion for reconsideration, requesting the court reverse the summary judgment grant provided to plaintiffs and instead hold that Werner was entitled to judgment as a matter of law on the sleeper berth claims. The new judge *partially* granted Werner's motion, reversed the plaintiffs' summary judgment award, but held that the issue of sleeper berth compensability was a mixed question of law and fact, and required a jury to resolve. 2017 WL 510884 (D. Neb. Feb. 2, 2017) (Smith Camp, J.) (vacating summary judgment award and holding that whether sleeper berth time is compensable must be determined by jury). Thus, in *Petrone*, the *same* court – without appellate review – reached inconsistent results, demonstrating that there is a *bona fide* dispute under the FLSA whether such time is compensable.

After the parties settled in principle, two new federal decisions which provided analysis on the compensability of sleeper berth time have been issued, both have which held that motor carriers must pay drivers for certain excessive sleeper berth time. First, in *Browne v. P.A.M. Transport, Inc.*, 5:16-CV-5366, 2018 WL 5118449, at *5 (W.D. Ark. Oct. 19, 2018), the Western District of

12

Arkansas held that the most amount of time a motor carrier can deduct for sleeper berth time in a day during a tour of duty of 8 hours. A similar decision was reached by a federal court in Arizona in December. *See Julian v. Swift Transportation Co. Inc.*, 360 F. Supp. 3d 932 (D. Ariz. 2018). Nevertheless, there remain no decisions from inside this circuit, nor any appellate authority, regarding this proposition.

Unlike Plaintiffs' sleeper berth claims (which the two recent cases provide additional support for Plaintiffs' contentions), new legal authority regarding whether a per diem constitutes part of the regular rate when calculated on a per-mile basis supports Defendant's position. Specifically, with respect to the inclusion of per diems in the calculation of the minimum wage, after the parties settled in principle, the Eight Circuit issued an opinion in *Baouch v. Werner Enterprises,* 908 F.3d 1107 (8th Cir. 2018), holding that the per diems payments paid by a motor carrier to its truck drivers could be used to satisfy the minimum wage where those per diems were based on the miles driven. Accordingly, while the Sixth Circuit has not made any similar rulings, both parties faced risks with respect to the impact of per diem payments on minimum wage calculations and damages.

If anything, the recent developments demonstrate precisely why the Parties have sought to settle the claims in a manner which leaves the Parties in control of the ultimate resolution of the litigation. As the development of the law continues, these unresolved legal issues present significant uncertainty and risk to each side if settlement is not finally approved.

### B. The Proposed Settlement is Fair and Reasonable.

In reviewing whether a FLSA settlement is fair, reasonable and adequate, courts should consider the following factors:

> (1) The existence of fraud or collusion behind the settlement;
> (2) The complexity, expense, and likely duration of the litigation;
> (3) The state of the proceedings and the amount of discovery completed;

13

(4) The probability of Plaintiff's success on the merits;
(5) The range of possible recovery; and
(6) The opinions of counsel.

*Nutting v Unilever Mfg. (U.S.) Inc.*, 2014 WL 2959481, at 3 (W.D. Tenn. June 13, 2014); (citing

*Dees v. Hydradry, Inc.,* 706 F. Supp. 2d 1227, 1241 (M.D. Fla. 2010); *Pessoa v. Countrywide*

*Home Loans, Inc.,* No. 2007 WL 101777, at *3 (M.D. Fla. April 2, 2007)); *see also Greene v.*

*Hepaco, LLC*, 2014 WL 2624900 (W.D. Tenn. June 12, 2014).

The settlement meets each of these factors, as outlined below.

1. There is No Collusion or Fraud Involved in the Proposed Settlement

There was no fraud or collusion involved in the settlement of these claims. Settlement is

the preferred means of resolving litigation. *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).

In reviewing settlement agreements to determine fairness, courts must recognize the "strong

presumption" in favor of finding that a settlement is fair and reasonable and must remain aware

that a settlement is a compromise, "a yielding of the highest hopes in exchange for certainty and

resolution." *Collins et al. v. Sanderson Farms, Inc., et al.,* 568 F.Supp.2d 714 (E.D. La. July 9,

2008) (citing *Camp v. Progressive Corp.,* 2004 WL 2149079 (E.D. La. Sept. 23, 2004); *Cotton v.*

*Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977); *In re General Motors Corp. Pick-Up Truck Fuel Tank*

*Prods. Liab. Litig.,* 55 F.3d 768, 806 (3d. Cir. 1995). There exists a presumption that no fraud or

collusion occurred between counsel in the absence of any evidence to the contrary. *Camp,* 2004

WL 2149079 at *7.

The parties have been represented by experienced and capable counsel and fiercely

litigated this matter for over four years. The parties filed motions to compel, motions for protective

order and other motions during their four years of litigation. Over one-hundred-thousand

documents were exchanged and millions of data-points reviewed, allowing the parties to assess

14

and argue the strengths and weaknesses of their respective positions, as well as perform settlement calculations.

Plaintiffs' Counsel and Named Plaintiffs have reviewed the terms of the settlement and believe that the settlement is fair and reasonable and is in the best interest of the collective plaintiffs. Additionally, notice of the settlement has been provided to the collective action class, and only a single member filed an objection to the settlement. As stated above, the settlement, which will provide an average of $450 per Plaintiff for alleged minimum wage violations, fully compensates drivers for their alleged non-liquidated damages for "on duty" and "short rest break" minimum wage violations, and provides approximately 30% of their potential non-liquidated damages on their sleeper berth and per diem claims. Moreover, the settlement will pay drivers now, rather than require drivers to risk their recovery on, as well as wait for, the outcome of dispositive motions, a jury trial, and an (almost certain) appeal—a process which would likely take multiple years. Defendants risked being found liable on one or all of Plaintiffs' claims and owing liquidated damages per the FLSA. Because of the substantial risk both parties faced, the settlement reflects a reasonable compromise in exchange for finality and certainty.

Given the complicated and unsettled legal issues, uncertainty of outcome and lengthy and expensive path to final resolution, settlement approval is warranted.

### 2. The Complexity, Expense, and Likely Duration of the Litigation

Were the Parties to proceed to trial on their claims, final resolution would likely take years after considering the inevitable appeals which would follow from the resolution of an undeveloped legal theory.

As stated above, the potential risks of trial are exacerbated by the complexity and relatively legally undeveloped nature of the claims (no opinions from any district court within the Sixth

15

Circuit or the Sixth Circuit Court of Appeals have been issued regarding the compensability of sleeper berth time). Of the few courts which have issued opinions elsewhere in the nation, there is significant inconsistency in the results. *Compare, i.e., Helde,* 982 F.Supp.2d 1189 (W.D. Wash., Oct. 9, 2013); *with Hurst*, 181 F.Supp.3d 827 (D. Ore. 2016). Plaintiffs' sleeper berth claim is so legally complex that it resulted in inconsistent results in *the same court*. *Compare Werner I and Werner II.*

Considering the parties' relative positions, the benefits of a settlement outweighed the risks of proceeding to trial. As such, the Settlement Agreement should be approved.

3. The State of the Proceedings and the Amount of Discovery Completed

Given that this is a wage and hour matter requiring workweek-by-workweek damage calculations, the parties have engaged in extensive discovery over the past four years. Defendants have produced more than 100,000 PDF documents, tens of millions of data-points, and Plaintiffs were required to hire experts to analyze Defendants' data in order to build a damages model and calculate damages for the class.

The Parties have conducted many depositions, including those of the Named Plaintiffs, a selection of Opt-in Plaintiffs, orientation instructors, training coordinators, and several of Defendants' executives and corporate designees.

Throughout the process, the Parties incurred fees for court reporters, and experts. Plaintiffs' retained expert was tasked with producing week-by-week damages estimates for the entire class using the produced documents, which included building a regression analysis to estimate damages for periods in which log records and pay records were lost or missing. The discovery process as a whole remained contentious, with the parties briefing a number of discovery issues in motions before the Court. Those discovery motions—involving requests for additional data sources from

16

Defendant, and Defendant's request to limit or preclude the taking of additional designee depositions—were also useful in framing the evidentiary issues for both sides.

Notably, the parties attempted mediation several times before they were finally successful. Given the significant discovery and motion practice that had *already* taken place by the time of settlement, the Parties were in a strong position to assess the strengths and weaknesses of the various claims and the risks of trial by the time of the fifth mediation. Accordingly, the Settlement Agreement should be approved.

4. <u>The Probability of Plaintiff's Success on the Merits and Range of Possible Recovery</u>

As outlined above, this matter concerned several legal issues on which courts are split, one of which resulted in opposing decisions *in the same court*. Given the uncertainty in the case law, it is axiomatic that there is a wide range of possible outcomes in this matter.

Plaintiffs in the *Cormier* matter seek unpaid wages from their time spent in Defendants' Orientation program and for time spent over-the-road driving for Defendants, specifically that Defendants failed to pay minimum wage during: (1) orientation; (2) all time logged "on duty" per DOT regulations; (3) short rest breaks of 20 minutes; (4) time beyond 8 hours per day Plaintiffs spent in the a truck sleeper's berth. The parties also disputed whether per diem payments could be used to satisfy the minimum wage.

The settlement provides opt-in Plaintiffs an average of approximately $450 (after fees/costs/administrative expenses) for releasing these claims. While the settlement agreement does not separate the award on a per-claim basis, such an award provides the full amount of the non-liquidated damages Plaintiffs allege were incurred for "on duty" DOT time and the short rest break claim (averaging $150 per driver) and provide approximately 30% of the estimated non-

17

liquidated damages for their other claims, providing a fair value on such claims. These amounts provided represents a fair settlement of the Plaintiffs' claims in this matter.

5. <u>Mr. Joseph Wimer's objections should be overruled.</u>

Of nearly 4,200 plaintiffs, only one, Mr. Joseph Wimer, filed an objection to the settlement.

Where only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement. *See Lonardo v. Travelers Indem.* Co., 706 F. Supp. 2d 766, 783 (N.D. Ohio 2010), *modified on reconsideration in part* (July 21, 2010). One objection out of 4,159 class members demonstrates that the collective action found the settlement fair and adequate. *See id.* When reviewing an objection, a court should distinguish between objections which seek to *improve* the Settlement Agreement with objections that assert the agreement is unfair, inadequate, or unreasonable under applicable law. *Id.*

In evaluating settlements, courts are not required "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Does 1 v. Deja Vu Consulting, Inc.*, No. 17-1801, 2019 WL 2336927, at *5 (6th Cir. June 3, 2019). Nevertheless, the court should scrutinize the litigation risks in complex class actions, specifically examine what the unnamed class members would give up in the proposed settlement, and then explain why—given their likelihood of success on the merits—the tradeoffs embodied in the settlement is fair to unnamed members of the class. *Id.* A court should look at the actual risks faced by the parties at hand rather than the general risks of litigation. *Id.* In *Deja Vu*, the Sixth Circuit found that the district court's analysis of a damages model based on two class members was sufficient to allow the district court to value the claims for purposes of approving the settlement.

18

Here, Mr. Wimer's objection may show a misunderstanding of the settlement terms, as he states that "the amount I will receive, *if any*, would only cover what wages I lost in the first two weeks." (emphasis added).[3] Mr. Wimer argues that the amount of the settlement as a whole is too low and that absent a higher number, Western Express may continue to choose not to change its pay practices.

Ultimately, this case is a minimum wage case filed under the FLSA. Of the more than 13,000 drivers who could have chosen to join the action, only about 4,200 filed consent forms. Moreover, the FLSA does not allow private parties to seek injunctive relief—only the Dept. of Labor may seek such remedies in an FLSA lawsuit. *Michigan Corrections Org. v. Michigan Dept. of Corrections*, 774 F.3d 895, 903 (6th Cir. 2014) ("The FLSA nowhere creates a private right of action to enjoin wage-and-hour violations and, to the contrary, grants all such authority to the Department of Labor.")

Thus, the purpose of the settlement is to obtain a reasonable financial recovery for the 4,200 drivers who chose to use this action as a vehicle to collect unpaid minimum wages. Whether the total amount is so much as to persuade Defendant to change its behavior is not the proper lens to determine if the settlement is fair and reasonable. The settlement waives no future claims of any driver for alleged FLSA violations. Thus, the proper lens is whether the payment provided to opt-in Plaintiffs is fair and reasonable for the minimum wage claims which they are waiving in exchange for the payment.

Objector Wimer's objection is essentially that the amount he will receive in the settlement is "way too low." He references a specific workweek in which he received $149.62 in pay and

---

[3] Plaintiffs' counsel attempted to call Mr. Wimer and left him a voicemail on the number provided by Mr. Wimer on his consent form. Mr. Wimer did not return the call.

19

worked 62 hours driving and on-duty. *See* Objection of Wimer, ECF Doc. No. 241. Wimer does not include any paystubs to reflect this week of pay. Nor does he include his total weeks worked, average hours worked, or average pay received for any other week. Assuming Wimer's report of his hours worked and pay for this week are accurate, he would be owed $299.88 in unpaid wages for this single week. Wimer also references another possible two weeks in which he alleges he is owed unpaid wages, and that the amount he would receive in the settlement approximates the "wages [he] lost in the first two weeks." *Id.*

Here, the Settlement Administrator has calculated that Wimer would receive approximately $468.30 from the settlement, or $19.51 per week worked (a $50 initial allocation and then $17.43 per week worked for a total of 24 weeks worked in the class period). *See* Exhibit 2, at ¶ 13. Class counsel then reviewed the data provided by Defendant for Wimer during discovery to calculate his individual damages. Declaration of Joshua Boyette, attached hereto as Exhibit 3, at ¶¶ 5-9. These damages models were based on Defendants' pay data (which shows how much drivers were paid) and driver log data (which shows how many hours drivers worked). However, because Defendants did not have all pay or log data for all drivers, Plaintiffs had to extrapolate the damages shown in the data that existed to account for the missing data. *Id.*

Wimer was one of the drivers for whom not all data was available, but Defendant did provide 9 weeks of data for Wimer. *Id.* Class counsel calculated Wimer's individual damages under two different theories of recovery: (1) That all Line 3/Line 4 time is compensable at the minimum wage; and (2) That all Line 3/Line 4 time plus all Sleeper Berth time beyond 8 hours per day is compensable at the minimum wage.

Wimer's damages under each scenario are set forth below:

**Line 3/Line 4 Damages**

| Week | Pay Week Start | Hours Worked | Weekly Pay | Minimum Wage Due | Damages |
|---|---|---|---|---|---|
| 1 | 1/1/2013 | 40.57 | 206.89 | $ 294.13 | $ 87.24 |
| 2 | 1/8/2013 | 60.15 | 1189.9 | $ 436.09 | 0 |
| 3 | 1/15/2013 | 63.22 | 941.5 | $ 458.35 | 0 |
| 4 | 1/22/2013 | 0.17 | 784.83 | $ 1.23 | 0 |
| 5 | 4/23/2013 | 39.67 | 487.39 | $ 287.61 | 0 |
| 6 | 4/30/2013 | 41.18 | 584.59 | $ 298.56 | 0 |
| 7 | 5/7/2013 | 60.13 | 563.67 | $ 435.94 | 0 |
| 8 | 5/14/2013 | 62.17 | 728.44 | $ 450.73 | 0 |
| 9 | 5/21/2013 | 29.13 | 395.25 | $ 211.19 | 0 |

Damages per week:    $9.69
Damages for 24 weeks: $232.56

**Line 3/Line 4 plus Sleeper Berth > 8 hrs**

| Week | Pay Week Start | Hours Worked | Weekly Pay | Minimum Wage Due | Damages |
|---|---|---|---|---|---|
| 1 | 1/1/2013 | 58.75 | 206.89 | $ 425.94 | $ 219.05 |
| 2 | 1/8/2013 | 76.03 | 1189.9 | $ 551.22 | 0 |
| 3 | 1/15/2013 | 75.57 | 941.5 | $ 547.88 | 0 |
| 4 | 1/22/2013 | 0.17 | 784.83 | $ 1.23 | 0 |
| 5 | 4/23/2013 | 48.5 | 487.39 | $ 351.63 | 0 |
| 6 | 4/30/2013 | 41.18 | 584.59 | $ 298.56 | 0 |
| 7 | 5/7/2013 | 60.13 | 563.67 | $ 435.94 | 0 |
| 8 | 5/14/2013 | 75.37 | 728.44 | $ 546.43 | 0 |
| 9 | 5/21/2013 | 29.15 | 395.25 | $ 211.34 | 0 |

Damages per week: $24.34
Damages per 24 weeks: $584.13.

Thus, under a scenario where all Line 3/Line 4 time is compensable, Wimer's damages under the model are calculated at $232.56, or $9.69 per week. *Id.* Where this time is compensable as well as all time logged as sleeper berth time in excess of 8 hours per day, Wimer's damages under the model are calculated at $584.13, or $24.34 per week. *Id.*

Notably, for the 9 weeks in which there is data for Wimer's pay and logs, there was only one week in which Wimer had damages under either analysis. Extrapolating out to 24 weeks, it

21

would be expected that Wimer would have 2-3 weeks in which he incurs damages, and that, in total, his damages for Line 3/Line 4 and sleeper berth violations would approximate $600.

Wimer's Line 3/Line damages are estimated to be $9.69 per week worked, and his excess sleeper berth damages on top of this come out to $14.65 per week worked. *See* Exhibit 3 at ¶ 9. The settlement amount Wimer will receive pays Wimer $19.51 per week ($468.30/24 weeks), or 80% of his Line 3/Line 4 and sleeper berth combined damages. When divided by claim, the settlement pays Wimer 100% of his Line 3/Line 4 damages, and about half of his sleeper berth damages—consistent with the compromise negotiated for the entire class. *See* Plaintiffs' Motion for Prelim. Approval at p. 12 (ECF Doc. 239).

Of course, in a settlement, the mere failure to recover all money owed does not render the settlement unfair or unreasonable. *See Does 1 v. Deja Vu Consulting, Inc.*, No. 17-1801, 2019 WL 2336927, at *5 (6th Cir. June 3, 2019) (reviewing settlement for fairness under Fed. R. Civ. P. 23(e)). Rather, the Court should balance what is being gained with what is being foregone in order to determine the fairness of the settlement. *Id.*

The risks to Mr. Wimer in proving his damages and receiving any award and the length of time it would take to resolve those issues are likewise representative of the challenges faced by the entire class. Here, the settlement is reasonable and should be approved, because the "tangible benefits afforded to the class outweigh the value of the volatile claims" being released. *See Does 1 v. Déjà vu Consulting, Inc.*, 2019 WL 2336927 at *6.

6. The Opinions of Counsel

The Parties were represented by experienced counsel, particularly adept at litigation of wage and hour matters within the trucking industry. The settlement was reached during arm's length negotiations following years of contentious litigation. Plaintiffs are represented by counsel

who are well informed and practiced in collective wage and hour litigation, and are realistic and knowledgeable of the risks of litigation and benefits of the settlement. Plaintiffs' counsel has substantial experience litigating complex wage and hour actions, including class actions and certified collective actions with tens of thousands of class members. *See* Exhibit 1, at ¶ 11. *See also Maddy v. Gen. Elec. Co.,* 2017 WL 2780741, at *7 (D.N.J. June 26, 2017) (*"Plaintiffs' counsel has substantial experience litigating wage and hours class actions. Indeed, attorneys Mr. Swidler and Mr. Swartz have litigated 90 [wage and hour] cases within the last 5 years."); *Keller v. T.D. Bank, N.A.*, 2014 U.S. Dist. LEXIS 155889 14 (E.D. Pa. 2014) (finding that Mr. Swartz and Swidler "have considerable experience handling class and collective action disputes" and noting that they "represented the Named Plaintiffs and the prospective class competently, diligently, and with professionalism throughout the course of this litigation."); *Campbell v. C.R. England, Inc.,* 2015 U.S. Dist. LEXIS 134235, *18 (D. Utah Sept. 30, 2015) (Swartz Swidler, LLC "has a reputation in the trucking industry as being one of the prominent firms to engage in FLSA litigation on behalf of truck drivers."). Plaintiffs' counsel has further been certified as class counsel in similar litigation wherein they represented tens of thousands of over-the-road drivers for alleged violations of state and federal minimum wage laws. *See Petrone v. Werner Enters.*, 2013 U.S. Dist. LEXIS 96375 (D. Neb. July 10, 2013); *Baouch v. Werner Enters.*, 2014 U.S. Dist. LEXIS 64981 (D. Neb. May 12, 2014).

Likewise, defense counsel King & Ballow has a significant management-side employment practice, and Defendants' lead counsel R. Eddie Wayland is a preeminent management-side employment law practitioner. Defense counsel in this case accordingly have extensive and significant experience in the litigation and settlement of significant and substantial employment matters, including class action wage and hour litigation.

Thus, the opinions of counsel are entitled to substantial deference in considering the fairness and adequacy of the settlement.

For all the reasons stated above, the settlement is fair, reasonable, and adequate and should be approved by the Court.

### C. The Settlement is Consistent with Public Policy.

Like other jurisdictions, the Sixth Circuit recognizes a strong public policy in favor of settlements. *Rusiecki v. City of Marquette.,* 64 Fed. Appx. 936, 936  (6th Cir. 2003).

The settlement here is consistent with that policy because it resolves a pending case on behalf of a potential opt-in class of more than 4000 individuals and avoids a jury trial and likely appeals that would affect these class members. Because the settlement represents a fair settlement of a *bona fide* dispute, public policy weighs heavily in favor of approval.

### III.    The Requested Attorneys' Fees and Costs are Reasonable and Should Be Approved.

Class Counsel here seeks to recover its reasonable fees and out-of-pocket costs incurred in litigating this matter. Class counsel expended 1431.6 hours of attorney time and 352.3 hours of paralegal time prosecuting this claim and fronted $300,811 in litigation costs. *See* Exhibit 1 at ¶¶ 5-6. Plaintiffs seeks attorneys' fees reflecting 1/3 of the settlement fund. Plaintiffs also seek reimbursement of $300,000 of Plaintiffs' litigation costs. Additionally, the settlement provides and the Court should approve paying the costs of administration of the settlement from the settlement fund. As discussed below, Class Counsel's requested fee award and costs are reasonable and should be approved.

### A. The FLSA Mandates that Reasonable Attorney's Fees be Paid to Class Counsel

Class counsel here seeks an award of fees of 33 1/3% of the total settlement (equivalent to $1,275,000). The requested fee is based on the substantial work Class Counsel performed in the Lawsuit and the substantial risk Class Counsel took in bringing and prosecuting the lawsuit. Class

24

Counsel took this case on a pure contingency and agreed to receive nothing in this matter – including waiving recoupment of all costs – if the class did not obtain a recovery in this matter.

For over four years, and as noted above, Class Counsel has diligently litigated this matter without any compensation. During that time, Class Counsel has incurred $300,811.00 in costs relating to the prosecution and settlement of this matter. *See* Exhibit 1 at ¶ 9. To date, Class Counsel has dedicated 1,431.6 hours of attorney time and 352.3 hours of paralegal time litigating this matter. *See* Exhibit 1 at ¶¶ 5-6; *see also* Attorney & Paralegal Time Records, *attached as* Exhibit 1-A.

The FLSA contains a fee-shifting provision that provides that the prevailing party shall recover reasonable attorney's fees and litigation costs. 29 U.S.C. § 216(b). Awards of attorney's fees under the FLSA are mandatory, though the Court has discretion over the amount of fees due the attorneys. *Thompson*, 2015 WL 867988 at *2 (citing *Cruz v. Vel-A-Da, Inc.,* 1993 WL 659253, at *3 (N.D. Ohio May 14, 1993)); *see also United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307 v. G & M Roofing and Sheet Metal Co.,* 732 F.2d 495, 501 (6th Cir. 1984). Even where the maximum recovery of an individual employee is relatively small because the unpaid wages are relatively small, an attorney may reasonably recover more than the employee. *Thompson*, 2015 WL 867988 at *2 (citing *Perdomo v. Sears, Roebuck & Co.,* 1999 WL 1427752, at*10 (M.D. Fla. Dec. 3, 1999) ($117,629.51 in fees and costs and $17,140.84 in damages); *Heder v. City of Two Rivers*, 255 F.Supp.2d 947, 955 (E.D. Wis. 2003) ($36,204.88 in fees and costs and $270 in damages). Courts in the Sixth Circuit have surmised that the possibility of an attorney's fee award that surpasses the plaintiff's damages adds incentive for an employer to quickly and justly resolve even minor unpaid wage claims. *Thompson*, 2015 WL 867988 at *2

(citing *Fegley v. Higgins*, 19 F.3d 1126, 1134-35 (6th Cir. 1994); *United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Ass'n, Local 307*, 732 F.2d at 501).

**B. A Percentage-Of-The-Fund Fee Allocation is Appropriate.**

The attorneys' fees and costs in this matter are requested as a percentage of the class recovery, which is the favored method of calculating attorneys' fees in class action cases. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980); *In re AT&T Corp.,* 455 F.3d 160, 164 (3d Cir. 2006); *In re Prudential Ins.*, 148 F.3d 283, 333 (3d Cir. 1998); *Court Awarded Attorney Fees, Report of Third Circuit Task Force*, 108 F.R.D. 237 (1985); *Bredbenner v. Liberty Travel, Inc.* 2011 U.S. Dist. LEXIS 38663 at *52-53 (D. NJ. Apr. 8, 2011) (common fund distribution for attorney's fees in hybrid FLSA/Rule 23 wage and hour case); *Gokare v. Fed. Express Corp*., No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094887, at *3 (W.D. Tenn. Nov. 22, 2013) (percentage of the fund methodology preferred in the Sixth Circuit for common fund cases); *Lonardo v. Travelers Indem. Co*., 706 F. Supp. 2d 766, 789 (N.D. Ohio 2010), *on reconsideration in part* (July 21, 2010); *Physicians of Winter Haven LLC v. Steris Corp*., No. 1:10 CV 264, 2012 WL 406966, at *3 (N.D. Ohio Feb. 6, 2012), *report and recommendation adopted*, No. 1:10CV264, 2012 WL 406976 (N.D. Ohio Feb. 8, 2012). The percentage-of-recovery method "is the prevailing methodology used by courts" for wage-and-hour cases." *Bredbenner*, 2011 U.S. Dist. LEXIS at *53, *citing, In re Janney*, 2009 U.S. Dist. LEXIS 60790 (E.D. Pa. 2009); *Chemi v. Champion Mortg.*, 2009 U.S. Dist. LEXIS 44860 (D.N.J. 2009); *Lenahan,* 2006 U.S. Dist. LEXIS 60307. This methodology is preferred because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Gokare v. Fed. Express Corp*., No. 2:11-CV-2131-JTF-CGC, 2013 WL 12094887, at *3.

The percentage of the common fund sought here—33 and 1/3%--is similar to other percentage-of-the-fund awards approved in other class action settlements in this Circuit. *See, e.g.,*

26

*Gokare.,* 2013 WL 12094887 at *4 (Nov. 22, 2013) (approving award of 30.9%); *Johnson v. Midwest Logistics Sys*., Ltd., 2013 WL 2295880 (S.D. Ohio May 24, 2013) (approving 33% attorneys' fees and expense award in common fund settlement); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *3 (E.D. Tenn. May 17, 2013) (approving 33% attorneys' fees award [totaling $52.9 million] in common fund settlement and noting that "the percentage requested is certainly within the range of fees often awarded in common fund cases, both nationwide and in the Sixth Circuit"); *Bessey v. Packerland Plainwell, Inc*., 2007 WL 3173972, at *4 (W.D. Mich. Oct. 26, 2007) (approving 31-32% attorneys' fees award and noting that " '[e]mpirical studies show that...fee awards in class actions average around one-third of recovery'").

Even in cases where statutory attorney's fees attach, such as the FLSA, the percentage-of-recovery doctrine is still the preferred manner to calculate attorney's fees. The lodestar method, whereby the attorney's time is multiplied by the reasonable hourly rate, remains *disfavored* because "regardless [of] how a total settlement structure is formally structured . . . every dollar given to class counsel means one less dollar for the class." *In re Cendant Corp. Litig.*, 264 F.3d 201, 256 (3d Cir. 2001); *see also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 821-822 (rejecting lodestar fee and directing that percentage-of-recovery should have been utilized even though the agreement for fees was ostensibly distinct from the agreement to pay class members because of the "economic reality" of such arrangement); *Dewey v. Volkswagen Aktiengesellschaft*, 558 Fed. Appx. 191, 199 (3d Cir. 2014) (affirming settlement, overruling objectors, and holding that the district court properly used a percentage-of-the-fund calculation in computing fees despite the fact that the underlying statute provided for attorney's fees to the prevailing party).

27

In awarding attorney's fees under the FLSA, courts may consider several factors:

> 1) The time and labor required; 2) the novelty and difficulty of the questions; 3) the skill requisite to perform the legal service properly; 4) the preclusion of employment by the attorney due to acceptance of the case; 5) the customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases.

*Hensley et al. v. Eckerhart et al.* 461 U.S. 424, 433 (1983). "A court also has discretion to enhance a fee because of the public importance or other extraordinary feature of a case." *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140 (8th Cir. 1982). Additionally, courts have suggested that a "cross-check" in the fee-award against the lodestar award method should be utilized to evaluate whether the request is fair. *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000); *see also In re AT&T Corp.*, 455 F.3d 160, 195 (3d Cir. 2006).

1. <u>The Time and Labor Required. the Preclusion of Employment by the Attorney Due to Acceptance of the Case, and the Nature and Length of the Professional Relationship with the Client</u>

For over 4 years, and as noted above, Class Counsel has diligently litigated this matter without any compensation. During that time, Class Counsel has incurred more than $300,000 in out-of-pocket costs relating to the prosecution and settlement of this matter. *See* Exhibit 1 at ¶ 9. To date, Class Counsel has dedicated 1431.6 hours of attorney time and 352.3 hours of paralegal time litigating this matter. *See* Exhibit 1 at ¶¶ 5-6.

With respect to the preclusion of other employment factor, "this guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson v. Georgia Highway*, 488 F.2d 714, 718 (5th Cir. 1974).

28

As the Court would likely gather on its own, considering the significant time investment required for a case of this scope and size, there was significant opportunity costs associated with the acceptance and full litigation of this matter.

These factors accordingly weigh in favor of Plaintiffs' requested fee award.

    2.   <u>The Novelty and Difficulty of the Questions and the Skill Requisite to Perform the Legal Service Properly</u>

Here, as discussed above, this case poses many extraordinarily complex factual and legal issues, which created risks as to liability, class certification, and damages.

Plaintiffs' wage and hour claims were far from run-of-the-mill or boilerplate, but instead involved novel areas of law that are yet unsettled. But for the issue of unpaid DOT "On-Duty" time (a claim which Defendants *still* opposed throughout litigation) – none of the dispositive legal issues are settled law. Plaintiffs' Sleeper Berth and Orientation claims are especially novel and the regulations underlying them are complex, as is evident from the varying results obtained in similar lawsuits.

Substantial document review and expert analysis was required in litigating these claims. Class Counsel were required to review over 100,000 produced documents to further develop the factual and legal bases of their claims. Plaintiffs' experts were tasked with reviewing wage and time records for over 4,000 individuals on a week-by-week basis to develop a damage figure that was used in litigating and in negotiating a settlement, including using regression analysis to estimate damages where records were lost or were otherwise unavailable. Both tasks were lengthy and costly endeavors that were undertaken with great diligence and skill, as was the necessity.

Accordingly, these factors demonstrate that Class Counsel's fee request is reasonable.

### 3. The Experience, Reputation, and Ability of the Attorneys

Class Counsel has substantial experience in litigating class action wage and hour cases. As discussed in the accompanying affidavit, Swartz Swidler have litigated more than 90 putative federal wage and hour class actions in the last decade, and are currently certified class or collective counsel in several wage and hour class actions throughout the United States, collectively representing more than 80,000 workers. *See* Exhibit 1 at ¶ 9. Swartz Swidler has been recognized by courts across the country as being particularly skilled in this area of the law. *See supra.*

Hence, this factor weighs in favor of approving the proposed fee award.

### 4. The Customary Fee, Whether the Fee is Fixed or Contingent and Awards in Similar Cases

"Fee awards have ranged from nineteen percent to forty-five percent of the settlement fund.*" In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 822 (3d Cir. 1995); *In re Cendant,* 264 F.3d at 339; *Bredbenner*, 2011 U.S. Dist. LEXIS at *54-56.

Smaller percentages are reserved for large settlements, typically $100 million or higher, which may involve hundreds of thousands, if not millions of class members, and where class counsel did not incur substantial additional efforts by the inclusion of such persons. *See In re Cendant Corp.,* 243 F.3d at 736.

Even where attorney's fees outweigh the recovery of any individual plaintiff, such fees may be recovered where the potential maximum recovery for any one employee is relatively small given a small amount of unpaid wages. *Williams v. Bevill*, 2016 WL 773230 (E.D. Tenn. Feb. 8, 2016) (citing *Perdomo v. Sears, Roebuck & Co.,* 1999 WL 1427752, at *10 (M.D. Fla. Dec. 3, 1999); *Heder v. City of Two Rivers*, 255 F. Supp. 2d 947, 955 (E.D. Wis. 2003); *Perrin v. John B. Wbb & Assocs.,* 2005 WL 2465022, at *4 (M.D. Fla. Oct. 6, 2005). This is in part due to understanding that the possibility of attorney's fees that surpass back wage awards act as a

30

deterrent to wage violations. *Id.* (citing *Fegley v. Higgins*, 19 F.3d 1126, 1134-35 (6th Cir. 1994)). Further, reasonable attorney's fees should also compensate the work of paralegals. *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 289 (1989).

Class Counsel took this case on a pure contingency and agreed to receive nothing in this matter – including waiving recoupment of all costs – if the class did not obtain a recovery in this matter. The requested fee award is especially reasonable given the substantial risk that such an endeavor entails.

Accordingly, the requested award is consistent with awards courts routinely approve and is reasonable given the circumstances under which Class Counsel litigated this matter.

5. The Amount Involved and the Result Obtained

As noted above, the settlement in this matter compensates the class for a substantial portion of the amount in controversy. The settlement provides payment to over 4,100 class members for 100% of the damages incurred for their DOT "on duty" and short rest break claims as well as approximately 30% of the value of their remaining claims. This is a fair and appropriate recovery for class members.

Class Counsel has managed to transform a putative collective action with four named plaintiffs into a $3,825,000 settlement from which over 4,100 workers will compensation in resolution of contested legal theories of compensability of time worked by truck drivers. Accordingly, this factor supports the requested fee because of the larger number of individuals and the material benefit provided to the class members.

6. The "Undesirability" of the Case

This case sought minimum wage damages on behalf of over-the-road truck drivers who typically worked for less than a year for Defendant. To prove the claim, Plaintiffs' counsel, quite

31

predictably, needed to incur significant fees and expenses with no guarantee of recovery. *See, e.g., Morales v. Farmland Foods, Inc.*, No. 8:08CV504, 2013 WL 1704722, at *9 (D. Neb. Apr. 18, 2013) (in considering a fee application in a wage-and-hour case, this Court weighed heavily the fact that that plaintiffs' counsel needed to incur "significant fees and expenses with no guarantee of recovery"). Moreover, where the workforce tends to be transitory and low-income, courts recognize that the case is more difficult to investigate and is thus further less desirable. *Id.* And the record is clear that conducting discovery—including depositions and responding to interrogatories and truck drivers—was significantly labor intensive given the nature of over-the-road truck drivers' schedules. These "factors make a case of this nature expensive to prosecute; pursuing these cases involves assuming a substantial financial risk and requires a significant outlay of resources." *Id.* at *36.

   Accordingly, this factor weighs in favor of Plaintiffs' requested fee award.

     7. <u>Lodestar Cross-check</u>

   Finally, the requested fee is also supported by the lodestar cross-check. The cross-check is performed by calculating the "lodestar multiplier." *In re AT&T Corp.*, 455 F.3d at 164. The lodestar multiplier is determined by dividing the requested fee award, determined from the percentage-of-recovery method, by the lodestar. *Id.* The lodestar multiplier accounts for "the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *See In re Rite Aid*, 396 F.3d 294, 306 (3d. Cir. 2005) (*citing Task Force Report*, 108 F.R.D. at 243) (approving a lodestar multiplier of ***4.07***). Courts have recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *In Re Prudential Ins.,* 148 F.3d 283, 341 (3d Cir. 1998). A court may consider reducing the percentage-of-recovery award when the multiplier is too high (*i.e.* much greater than 4x). *See In re Rite Aid,* 396 F.3d at

32

306. In determining the lodestar for cross-check purposes, the court need not engage in a "full-blown lodestar inquiry," *In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 169 n.6 (3d Cir. 2006), or "mathematical precision," *In re Rite Aid Corp.*, 396 F.3d at 306-07. A court need not involve itself with "a review of actual [attorney] time sheets." *Dewey v. Volkswagen of Am.*, 728 F. Supp. 2d 546, 592-93 (D. NJ. 2010). Additionally, while lodestar multipliers are a relevant consideration in determining if the fee request is reasonable, "the lodestar cross-check does not trump the primary reliance on the percentage of common fund method." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005).

"In performing the lodestar cross-check, the district courts should apply blended billing rates that approximate the fee structure of all the attorneys who worked on the matter." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306. Here, Class Counsel requests the Court utilize a blended rate of $475 per hour for all hours performed by Class Counsel. As discussed below, the rates are reasonable considering the experience and expertise of all Class Counsel.

Five years ago, in 2014, the Eastern District of Pennsylvania found that $500 per hour was a reasonable hourly rate for partners of Swartz Swidler, and $350 per hour was reasonable for associates. *Keller*, 2014 U.S. Dist. LEXIS 155889, *42. More recently, the Central District of California, over a contested motion, found a reasonable rate for Mr. Swidler in a trucking wage and hour case to be $600/hour. *Ayala v. U.S. Xpress Enterprises, Inc.*, 2019 WL 1581395, at *3 (C.D. Cal. Feb. 13, 2019).

These rates are in line with hourly rates provided in other wage and hour cases across the country. *See Aguayo v. Bassam Odeh, Inc.*, No. 3:13-CV-2951-B, 2016 U.S. Dist. LEXIS 169702, at *47 (N.D. Tex. Dec. 8, 2016) ($700/hour for named partner; $400/hour for senior attorney; and $267-$350 per hour for associates); *Fox v. Tyson Foods, Inc.*, No. 4:99-CV-1612-VEH, 2009 U.S.

Dist. LEXIS 133215, at *47 (N.D. Ala. Feb. 17, 2009) (finding that national market applied and finding rates for FLSA litigation of $550/hour for partners and $200-$400/hour for associates reasonable); *Guallpa v. NY Pro Signs Inc.,* 2014 U.S. Dist. LEXIS 77033, at *29 (S.D.N.Y. May 27, 2014) (approving rates of $500-$600 per hour for partners and $325 for associate); *McClean v. Health Sys.*, No. 6:11-CV-03037-DGK, 2015 U.S. Dist. LEXIS 181213, at *7 (W.D. Mo. Aug. 4, 2015) ($350-400/hour reasonable for FLSA attorney in collective action, approving $1,250,275 fee request where recovery was $1,567,186); *Morales v. Farmland Foods, Inc.*, No. 8:08CV504, 2013 U.S. Dist. LEXIS 56501, at *10 (D. Neb. Apr. 18, 2013) (approving Chicago rate for wage-and-hour class action attorneys and providing up to $700/hour for senior partners, approving $2,008,142 in fees on a $275,000 settlement).

Based on these rates, and recognizing that vast majority of all the attorney hours worked in this case were performed by partners, Plaintiffs here request the Court approve a blended rate of $475 per hour for all attorney time and $125 per hour for all paralegal time.

Utilizing these rates produces a lodestar multiplier of less than 1, as calculated below:

1. Multiplying the number of attorney hours currently expended (1,431.6) by the hourly rate ($475) to arrive at the attorney lodestar: $680,010;

2. Multiplying the number of paralegal hours currently expended (352.3) by the hourly rate ($125) to arrive at the paralegal lodestar: $44,037.50;

3. Adding the attorney and paralegal lodestar to arrive at the lodestar: $724,047.50.

4. Dividing the Fees Requested (Based on the Percentage of the fund) ($1,275,000) by the lodestar figure ($724,047.50) to arrive at the lodestar multiplier: 1.76.

Accordingly, the fee requested is well within the lodestar cross-check multiplier, as the cross-check produces a multiplier of 1.76, which is well below the permissible multiplier of 4, which is "frequently" awarded. Hence, this cross-check verifies that the fee requested is reasonable for the work performed.

For these reasons, it is respectfully requested that this Court grant Class Counsels' fee application.

## IV. The Court should reward Class Counsel with Reimbursement for their Out-of-Pocket Costs.

"There is no reason to reject the request for reimbursement of [expenses] that counsel have spent out of their own pockets in litigating [a class action] case." *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *35-36 (E.D. Pa. Oct. 13, 2004). Moreover, "attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *40 (E.D. Pa. Jan. 4, 2001); *see also In re Fasteners Antitrust Litig.,* 2014 U.S. Dist. LEXIS 9990 (E.D. Pa. Jan. 27, 2014).

Here, Class Counsel incurred more than $300,000 in out-of-pocket costs in litigating this matter. *See* Exhibit 2 at ¶ 9. The amount of costs exceeds the amount that Class Counsel agreed it would seek to recover from the class award (the notice stated Class Counsel would not seek more than $300,000 in out-of-pocket costs; because the actual costs exceed that amount, Class Counsel here only seeks to recover $300,000). No class member objected to Class Counsel recouping their costs from the settlement fund, and the notice informed class members that Class Counsel would

35

seek to recover out-of-pocket costs totaling up to $300,000, in addition to the cost of administration. Accordingly, Class Counsel respectfully requests to be awarded such costs.

**V.**     **The Court should award the settlement administrator its costs and fees.**

The Court appointed Angeion Group to administer the settlement. Angeion has dutifully complied with its role as the notice administrator and will fulfill its duties in distributing the final notices and settlement payments. *See* Exhibit 2 at ¶¶ 5-13. The settlement notice explained that the costs of the litigation would be paid by the Settlement Fund. *See* Exhibit 2-A, pp. 2. No class member objected to the payment of the settlement administrator from the fund. Thus, Plaintiffs respectfully request the Court order that Angeion shall be paid for its services from the Settlement Fund.

**VI.**     **This Court should award the requested service payments for Named Plaintiffs.**

The four named Plaintiffs, Pierre Cormier, David Harmon, Michael Sowa, and Johannes Stolvoort, seek service awards of $7,500 each. Likewise, Plaintiffs seek service awards of $500 for each of the 13 Opt-In Plaintiffs who were deposed by Defendant in this litigation.[4]

"The purpose of [service] payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Bredbenner v. Liberty Travel, Inc.,* 2011 U.S. Dist. LEXIS 38663, 63-64 (D.N.J. Apr. 8, 2011). By bringing suit against a large company and having documents publicly filed with his name on them, named plaintiffs who assist in class action litigation "[take] on certain risks. By bringing suit against a major

---

[4] The thirteen opt-in plaintiffs deposed are (1) Stephen Tieku; (2) Curtis Willis; (3) Michael Robinson; (4) Quincy Crow); (5) Bina Batchelder; (6) Tuan Chu; (7) Richard Bayer; (8) Billy Sissoko; (9) Edward Riley; (10) Corey Johnson; (11) Kevin Kauffman; (12) Mark Bonner; and (13) Gary Caudle.

company[,]… they risk their good will and job security in the industry for the benefit of the class as a whole." *Id.*; *see also UFCW Local 880-Retail Food v. Newmont Mining Corp.,* 32 Fed. Appx. 232, 235 (10th Cir. 2009) ("a class representative may be entitled to an award for personal risk incurred or additional effort and expertise provided for the benefit of the class"); *Whittington v. Taco Bell of Am., Inc.,* 2013 U.S. Dist. LEXIS 161665, *24 (D. Colo. Nov. 13, 2013) (approving service payment for the named plaintiff of $7,500); *In re Bank of Am. Wage & Hour Empl. Litig.,* 2013 U.S. Dist. LEXIS 180056, *26 (D. Kan. Dec. 18, 2013) (approving service payments which in aggregate would not exceed $200,000).

Here, Named Plaintiffs greatly assisted in the litigation and the resolution of this matter. They provided information to Class Counsel early in this litigation and traveled to Nashville and were deposed prior to collective action certification. Had the Named Plaintiffs not done so, this matter would not have been certified, and the more than 4,100 opt-in plaintiffs who will be paid in this settlement may have received nothing. Moreover, throughout the lawsuit, the Named Plaintiffs remained involved, providing insight to Class Counsel into the evidence and claims for the benefit of all collective action members.

The four Named Plaintiffs regularly conferenced with Class Counsel to discuss the case, including spending a significant amount of time discussing their experiences while employed by Defendants with Class Counsel, reviewing documents, provided assistance in settlement discussions, and assistance in developing a better understanding of Defendants' factual defenses. The efforts and risks made by the Named Plaintiffs were not shared by any opt-in Plaintiffs in this case. Exhibit 1 at ¶ 7. Accordingly, Plaintiffs' counsel requests $7500 for each of the Named Plaintiffs.

37

Nor should the efforts of the opt-in Plaintiff deponents be overlooked, as they too unselfishly endeavored to take time away from their personal obligations, traveling from all over the country to Nashville, to give crucial testimony that permitted the parties to further develop their theories and litigate this case. Plaintiffs' Counsel further requests that the Court authorize service payments of $500 to each of the thirteen Opt-In Plaintiffs who attended depositions, further developing and adding value to Plaintiffs' claims.

The service payments here are well within the amounts regularly provided in similar cases. *See e.g. Salinas v. U.S. Xpress Enterprises, Inc.,* No. 1:13-cv-245, 2018 WL 1475610, at *1 (E.D. Tenn. Mar. 26, 2018) (accepting a class representative's service award of $ 10,000.00); *Flores v. Mamma Lombardi's of Holbrook, Inc.,* 104 F. Supp. 3d 290, 316 (E.D.N.Y. 2015) (same); *Whittington,* 2013 U.S. Dist. LEXIS 161665, *24 (approving service payment for the named plaintiff of $7,500); *Paxton v. Bluegreen Vacations Unlimited,* No. 3:16-CV-523, 2019 WL 2067224, at *3 (E.D. Tenn. May 9, 2019) (approving service awards of $5000) *Bredbenner,* 2011 U.S. Dist. LEXIS 38663 at *68 ($10,000 each for of the 8 named plaintiffs); *Dewey,* 728 F. Supp. 2d at 610 ($10,000); *see also Newberg on Class Actions* § 11,38, at 11-80 (citing empirical study from 2006 that found average award per class representative to be $16,000).

For these reasons, the class has greatly benefited from the efforts of Named Plaintiff and the opt-in deponents and it is accordingly requested that the service payments be awarded.

## CONCLUSION

For the reasons stated above, Plaintiffs request that the Court enter an Order granting approval to the settlement, awarding the requested attorney's fees and costs, and awarding the requested service payments.

Respectfully submitted,

38

/s/ Justin L. Swidler
Justin L. Swidler, Esq.
Joshua S. Boyette, Esq.
Richard S. Swartz, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Highway North, Ste. 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420
Fax: (856) 685-7417

Dated: June 4, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion and supporting documents were filed electronically with the Court and electronically served, via ECF, on June 5, 2019, upon:

R. Eddie Wayland
King & Ballow
315 Union Street
Suite 1100
Nashville, TN, 37201
Phone: (615) 726-5430
*Attorneys for Defendant*

By: */s/ Justin Swidler*
Justin L. Swidler
SWARTZ SWIDLER LLC
1101 Kings Highway N., Suite 402
Cherry Hill, NJ, 08034
Phone: 856-685-7420
Fax: 856-685-7417

40